**Calvin BRADLEY, Appellant,**

v.

**Otis R. BOWEN,\* Secretary of the United States Department of Health and Human Services, Appellee.**

**No. 85–1658.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 14, 1986.

Decided Sept. 9, 1986.

\* Otis Bowen succeeded Margaret M. Heckler as Secretary of Health and Human Services during the pendency of this appeal and is substituted as the appellee. *See* Fed.R.App.P. 43(c).

Denver L. Thornton, El Dorado, Ark., for appellant.

Karen J. Behner, H.H.S., Dallas, Tex., for appellee.

Before HEANEY, ARNOLD and WOLL-MAN, Circuit Judges.

HEANEY, Circuit Judge.

Calvin Bradley appeals from a district court decision affirming the Secretary of Health and Human Services' denial of disability insurance benefits. For reversal, Bradley argues that the administrative law judge (ALJ) failed to follow procedural guidelines and to fully apply the substantive law. Bradley also argues that the ALJ failed to give due consideration to his medical and psychological impairments, separately and in combination. We reverse.

Calvin Bradley is a fifty-five-year-old man with a graduate equivalency degree and approximately four months of college training. He worked as a billing clerk from 1964 to 1969 and as a meter reader from 1969 to February 15, 1980, at which time he alleges he became disabled because of a heart condition. His initial claim for disability benefits was denied at all administrative levels, but the district court remanded with instructions that the ALJ obtain for Bradley consultative general medical and general psychiatric examinations. After the subsequent supplemental hearing, the ALJ found that Bradley suffered from sinus bradycardia, symptomatic; chronic obstructive pulmonary disease; depression; premature ventricular beats; and macrocytic anemia. The ALJ, however, concluded that Bradley was not disabled.

He does suffer from a severe impairment which is not a listed impairment and is not the equivalent of a listed impairment. A careful evaluation of the entire evidence reflects that Mr. Bradley retains the residual functional capacity to engage in at least sedentary work as that term is defined in the Social Security Regulations (which involves sitting, a certain amount of standing and walking, and lifting no more than 10 pounds at a time). This permits the performance of his past relevant work as a billing clerk for a utility company. He does have nonexertional impairments consisting of a depressive illness with neurotic tendencies and pain and discomfort; however, these are not such as would reduce his residual functional capacity to the point that he would not be able to engage in his past work activity.

*Calvin Bradley*, recommended decision at 10 (June 21, 1983).

■ Bradley bore the initial burden of proving that he was disabled within the

meaning of the Social Security Act. *Parsons v. Heckler*, 739 F.2d 1334, 1339 (8th Cir.1984); *McCoy v. Schweiker*, 683 F.2d 1138, 1146–47 (8th Cir.1982). He first asserts that he met this burden by proving he suffered from an impairment listed in appendix 1, 20 C.F.R. pt. 404, subpt. P (1985), and thus was entitled to an automatic finding of disability regardless of his personal background or work experience. *See Florer v. Heckler*, 777 F.2d 1321 (8th Cir.1985); 20 C.F.R. § 404.1520(d) (1985). Specifically, Bradley contends he suffered from a severe cardiac impairment as described by section 4.00 of that appendix.[1] Social Security regulations, however, list specific medical findings, ensuring the appropriate degree of severity, which must be met if a claimant's impairment is to qualify for appendix 1 automatic disability. 20 C.F.R. § 404.1525(d) (1985); *see* 20 C.F.R. pt. 404, subpt. P, app. 1, § 4.01 (1985). The ALJ found that Bradley's impairment was not of the necessary severity. After a careful review of the record, we find substantial evidence to support this conclusion.

■ Bradley contends that even if his impairment did not qualify under appendix 1, he established that he was unable to perform his past relevant work, shifting the burden to the Secretary to show other jobs in the economy he was capable of holding. *See e.g., Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir.1986); *Tucker v. Heckler*, 776 F.2d 793, 795 (8th Cir.1985). We agree. The evidence in the record that Bradley is incapable of performing sedentary work is overwhelming.

First, there is no reason to disregard the claimant's testimony with respect to his inability to perform sedentary work. His work record through 1979 was excellent. His testimony was corroborated by his wife, and no witness testified that his daily activities were other than stated by claimant and his wife. He has been treated by the Veterans Administration on a regular

basis since 1980 and takes a variety of prescribed medications including Quinidine, Ascriptin, Dipyridamole, Isosorbide, Inderal and Folic Acid daily.

Second, competent medical testimony supports the claimant's assertion that he is unable to perform sedentary work in the competitive work place. Dr. Kimber M. Stout stated on August 27, 1981:

Mr. Bradley has a clinically important rhythm disturbance and that activity worsens it. This could be potentially lethal for him. Therefore his exercise level must be restricted. This certainly disables him as regards performance of any job activity which he would otherwise be qualified for. Since this is a chronic problem it would appear that disability is permanent. My opinion is that his functional capacity is an early Class III and his therapeutic classification is Class C.

\*  \*  \*  \*  \*  \*

[H]e is suffering from chronic depression as well as heart disease. The depression may have been caused or aggravated by the limitations and anxiety from his heart disease.

Dr. Henry G. Hanley reported on February 11, 1981:

Very frequent PVC's with bigeminy and trigeminy, couplets and several episodes of 3 PVC's in a row (ventricular tachycardia). No episodes sustained longer than 3 in a row and symptoms don't correlate with episodes of ventricular tachycardia.

Dr. Thomas W. Atkinson reported on August 12, 1982:

Patient was admitted with emotional instability thought to be secondary to Procan. Procan SR was stopped and Quinidine was started. The patient remained asymptomatic through all the bigeminy, trigeminy and PVC focuses. Rhythm was irregularly irregular with monitor showing 60 beats per minute but

---

1. The section relied on by Bradley provides in part that *"[s]evere cardiac impairment* results from one or more of three consequences of heart disease: (1) Congestive heart failure; (2) ischemia (with or without necrosis) of heart muscle; (3) conduction disturbances and/or arrhythmias resulting in cardiac syncope." 20 C.F.R. pt. 404, subpt. P, app. 1, § 4.00(A).

pulse occasionally showed only 30 beats per minute.

\* \* \* \* \* \*

Patient is being discharged home with his wife, is to return to Cardiology Clinic 9–16–86 at 8: a.m. with an EKG, also patient is to return to General Medicine Clinic on that same date if possible to followup on his macrocytosis[.] Discharge medications Quinidine 400 qid, Inderal 40 mg qid, Isordil 40 mg q 4 hrs., DSS 250 mg q AM, Ascriptin 2 bid, Persantine 50 mg tid.

Dr. B. Vickers, on July 27, 1982, reported:

CHEST: Moderate emphysema. Chest otherwise negative.

Dr. R. Shehane reported on July 22, 1982:

Frequent unifocal PVC's and occasional short runs of bigeminy are recorded.

Dr. Stout filed a second report on March 10, 1983, in which he stated:

Mr. Bradley was seen here 8–27–81 for cardiac evaluation[.] Since that time Mr. Bradley has been hospitalized for extensive periods of time on three separate occasions in 1982. \* \* \* In August, he was entered under Emergency conditions at the Shreveport VA where he was hospitalized until September. Apparently he lost consciousness, quit beating and was taken to Intensive Care Unit. He doesn't remember any of this, his wife says they told her that he was having V3 attacks; I interpret this as meaning V fib attacks. Apparently his heart did "quit breathing" on several occasions. His medications were changed at that time[.] Since that time he has not required further hospitalization.

He continues to have limited exercise tolerance, complicated by dizziness and dyspnea on exertion after walking 1–2 blocks. He does describe episodes of chest pain[.] Some of the pains are sharp, electric shock type sudden pains;

there is reproducable pain that occurs in his left shoulder if he bends forward too far; he also has a left upper quadrant tenderness. His memory is poor and on several occasions he temporarily blacked out. \* \* \*

\* \* \* \* \* \*

I feel that he remains totally disabled on the basis of his cardiac disease. I also feel that the problem is demonstrably chronic and that there is no reasonable expectation that he will ever be able to gainfully return to employment.

Dr. Charles M. Spellman, a psychologist retained by the Social Security Administration, reported on March 9, 1983:

Client is functioning within the dull normal range of intelligence as measured by the WAIS–R \* \* \*.

It must be noted that no doctor indicated that claimant was able to do any work. Two stated that he was totally disabled, and one indicated that he probably could function satisfactorily with a pacemaker. One further observation with respect to the medical record is in order. Page after page of the original hospital and medical reports cannot be read. Ordinarily, this fact alone would be cause for remand. Here, however, the claim has been pending for nearly six years and has been heard twice by an ALJ; thus, we will take the record as we find it.

Third, the testimony of the vocational expert does not support the findings of the ALJ. This matter was properly remanded by the district court to secure the testimony of a vocational expert as to whether the claimant, in light of his exertional and nonexertional impairments, could perform his past work as a billing clerk. As so frequently happens, the ALJ failed to properly examine the expert.[2]

One of the first questions posed was, "[L]et's assume \* \* \* that the claimant has

---

**2.** This Court has repeatedly held that vocational testimony elicited by hypothetical questions that fail to relate with precision the physical and mental impairments of the claimant cannot constitute substantial evidence to support the Secretary's decision. *See e.g., Gilliam v. Califano,* 620 F.2d 691, 693–94 (8th Cir.1980); *Stephens v. Secretary of HEW,* 603 F.2d 36, 41 (8th Cir. 1979); *Behnen v. Califano,* 588 F.2d 252, 255 (8th Cir.1978); *Daniels v. Mathews,* 567 F.2d 845, 848 (8th Cir.1977).

capacity for sedentary [work]. * * * [W]ould [the] [tr]ansferable [sic] skills that you been describing [be] [trans]fered [sic] to sedentary work?" (The skills referred to were reach, handle and vision.) He answered, "Yes, sir." Supplemental Court Remand Transcript (SCRT), 228. With that answer, the ALJ had no further questions. The question and answer shed no light on whether there was sedentary work in the national economy which the claimant could perform. It only pointed out the obvious: if claimant can do sedentary work, there is work in the national economy which he can perform.

At that point, the claimant's attorney cross-examined the expert. Under that examination, the expert revealed that he had not read the psychiatrist's report discussing the claimant's mental health. SCRT, 233. When shown the report, the expert stated that he did not know what the doctor meant when he said that the claimant could not handle his own finances, but the expert conceded that the claimant could have a problem making occupational adjustments. SCRT, 232–33.

The ALJ then made an unsuccessful effort to rehabilitate the witness.

Q. Let me ask you one other hypothetical question? *Let's assume that the claimant as I previously stated has the capacity for sedentary work* [again the question assumes the fact to be proved] that he has transferable skills. In addition to his exertional problems which are largely a result of the heart disease and perhaps chronic pulmonary disease as well, he also has according to Dr. Thomas, let's see, a depressive illness [sic] with neurotic tendencies. He has black out spells but he doesn't have epilepsy. He has emphazema [sic]. In addition in evaluating the claimant's problems, the doctor says that his memory for resent [sic] and past events was good, his fund of information was good, his calculations was [sic] good, his abstract thinking was fair, his ability to identify similarities and differences good, judgement good. Now with that in mind, adding to the claim-

ant's impairments, would he be able to engage in the sedentary jobs that you have been describing?

A. Your Honor, depending upon the extent of the those [sic] depression and so forth, if it is a constant resistant thing, *he would have problems.*

Q. All right. Well. As well as we could, we have attempted it [sic] to limit it. I am aware of course that the prognosis is guarded to poor and it states that he is unable to handle his insurance funds, however [the] Dr. doesn't explain why he would be able to. He is able to concentrate to the extent I would think that he would have no difficulty in that. With his funds.

A. He would have no trouble, he posses [sic] the skills.

Q. Now this additional limitation which is nonexertional would he be able to function in a sedentary capacity in the jobs that you have described?

A. Your Honor, *he would likely have some problem in these jobs,* that I have listed.

Q. The doctor did not favor us with a DSNM diagnosis. So I don't know if he considered him a depressive neurosis, mild, moderate severe or whatever because the little magic numbers are not in there so there is no way for me to tell. I just have to give it to you ask [sic] he has got it. And that is depressive illness with neurotic tendencies.

A. As I have stated before, the extent of that and the persistance [sic] of it, would be a factor.

Q. Of course I don't know how—I will just ask you again. Let's assume that his depressive illness if [sic] of moderate severity. [There is no basis in the record for this assumption.] Now would he be able to handle these sedentary jobs?

A. In my judgement, he would your Honor.

SCRT, 236–38 (emphasis added).

The ALJ's opinion, in stating the evidence, repeatedly slights the opinions given by treating physicians, especially Dr. Stout.

In addition, the ALJ's conduct at the hearing indicates that he became an advocate against Bradley. Dr. Ozment, a consulting physician whom Bradley saw by arrangement of HHS, does give a strong opinion supporting the ALJ's position, but under our cases an opinion given by such a consulting physician is normally not substantial evidence.

We are convinced that Bradley proved that he cannot return to any past relevant work. Ordinarily, the burden would then shift to the Secretary, and he would be given a chance to prove that there are other jobs that Bradley can perform. However, there has already been one remand and we are not confident that a second remand will produce a correct decision. Also, Bradley has shown that he cannot do sedentary work, and that is the lowest grade of work recognized by the regulations. We therefore reverse and remand to the Secretary with directions to award benefits to Bradley.