ROBERT W. PRATT, U.S. DISTRICT JUDGE
Plaintiff, Mark E. Condon, filed a Complaint in this Court on March 3, 2017, seeking review of the Commissioner's decision to deny his claim for Social Security benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq. This Court may review a final decision of the Commissioner. 42 U.S.C. § 405(g).
Plaintiff filed an application for benefits on November 8, 2013. Tr. at 241-44. Plaintiff, whose date of birth is November 21, 1955 (Tr. at 241), was 59 (Tr. at 50) years old at the time of the hearing on July 22, 2015, before Administrative Law Judge Henry Hamilton (ALJ). Tr. at 42-99. The ALJ issued a Notice Of Decision-Unfavorable on December 23, 2015. Tr. at 13-28. On January 3, 2017, the Appeals Council declined to review the ALJ's decision. Tr. at 1-3.
The ALJ found that Plaintiff was insured for disability insurance benefits until December 31, 2016. At the first step of the sequential evaluation ( 20 C.F.R. § 404.1520(a)(4) ), the ALJ found that Plaintiff did not engage in substantial gainful activity after June 28, 2013, the alleged onset of disability date. At the second step, the ALJ found Plaintiff has the following severe impairments: somatic symptom disorder, with predominant pain, persistent and severe; pain disorder associated with both psychological factors and general medical condition; major depressive disorder ; chronic headaches ; degenerative disk disease; essential hypertension ; diabetes mellitus ; anxiety disorder; obesity. Tr. at 18. The ALJ found that Plaintiff's impairments are not severe enough to qualify for benefits at the third step of the sequential evaluation. Tr. at 19. At the fourth step, the ALJ found:
After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except he can lift 50 pounds occasionally and 25 pounds frequently. He can stand, sit and walk for six hours out of an eight-hour day. He can push and pull as much as he can lift and carry. He can frequently climb ramps, stairs, ladders, ropes and scaffolds. He can frequently balance, stoop, kneel, crouch and crawl. He can *997 frequently work from unprotected heights and moving mechanical parts. He can frequently tolerate dust, odors, fumes and pulmonary irritants. He can frequently work around loud noise. He is limited to simple and routine tasks and time off tasks can be accommodated by normal breaks.
Tr. at 20. The ALJ found that Plaintiff is unable to perform any of his past relevant work[1] . Tr. at 26. At the fifth step of the sequential evaluation, the ALJ found that jobs exist in significant numbers which can be done within the limits of Plaintiff's residual functional capacity. Examples of such jobs are hand packager, store/laborer, and laundry worker. Tr. at 27. The ALJ found that Plaintiff is not disabled nor entitled to the benefits for which he applied. Tr. at 28.
MEDICAL EVIDENCE
On February 9, 2011, Plaintiff saw Wendy Muller, O.D. Tr. at 665-70. Plaintiff reported that he was working in a new building and that the lighting was really bothering him. Tr. at 655. After the examination, the doctor opined that Plaintiff needed to work in an environment with incandescent lighting and away from outside light/glare due to photophobia. Tr. at 668.
On February 22, 2011, Plaintiff saw Susan J. Snyder, D.O., to complete FMLA[2] paperwork. Tr. at 709-15. The doctor noted that on February 21, Plaintiff had been able to go back to his office, but that within thirty minutes he had a headache and eye discomfort. He was moved to a location which had different lightening, and was able to tolerate about four and a half hours of work before he had to leave. The doctor wrote: "I do not feel he is disabled and neither does he. I feel as though his symptoms are exacerbated under certain work conditions. When he is no longer in those work conditions, his symptoms abate and his performance is back to normal." Tr. at 709-10.
On February 14, 2011, Plaintiff saw Louis J. Scalion, M.D., at Wolfe Eye Clinic. Tr. at 673-75. Plaintiff complained of photophobia and soreness in both eyes. The doctor noted that during the course of the examination, Plaintiff seemed upset about his current work environment. When the doctor opined that dry eye syndrome was the cause of the problem, Plaintiff disagreed and said he knew it was the light exposure at work which was causing his problem. Tr. at 673.
On March 10, 2011, Plaintiff saw Dr. Snyder for a recheck of his blood pressure. Plaintiff reported that he was having difficulty sleeping. Tr. at 743-44. The doctor adjusted Plaintiff's blood pressure medication and prescribed lorazepam to take at bed time. Tr. at 744.
On April 8, 2011, Plaintiff saw Dr. Snyder for a recheck of his blood pressure which the doctor said continued to be "a little bit elevated." Plaintiff reported continued headaches and dizziness. Tr. at 745-46.
On April 13, 2011, Plaintiff saw Richard S. McCaughey, D.O., at Iowa Methodist Occupational Health and Wellness. Tr. at 676-77. Plaintiff reported that he worked for the State of Iowa as an accounting specialist. Around the first of the year, *998 Plaintiff moved into a new building and began to notice that he did not feel well. Plaintiff complained of eye pain, headache, fatigue, difficulty sleeping, and difficulty with thought process. Plaintiff reported that his symptoms improve when he is away from the building, and that he could only be in the building for about an hour. Tr. at 676. The doctor suggested that the State might arrange for Plaintiff to work in a different building. The doctor also suggested that the State might seek the assistance of an industrial hygienist to suggest ways to improve the work environment. If neither of these suggestions provided a solution, the doctor recommended that Plaintiff follow up with his "personal doctor outside work comp." Tr. at 677.
On May 5, 2011, Plaintiff saw Dr. Snyder for blood pressure check. Plaintiff reported dizziness and headache within an hour of going to work. "He feels a lot of lethargy and mental fogginess." Tr. at 747-48.
On May 12, 2011, Plaintiff saw Mark Puricelli, D.O., at Ruan Neurology Clinic & Research Center. Tr. at 716-17. Plaintiff described bi-temporal throbbing headaches accompanied by nausea, photophobia, phonophobia, and feeling of general malaise. Plaintiff also noted that he felt dizzy and had chronic diarrhea on the days when he has headaches. Plaintiff reported that his symptoms clear on days he is not at work. Tr. at 716. After his examination, the doctor diagnosed migrainous headache. Because the headaches had an onset specific to a particular environment, the doctor wrote that Plaintiff did not have primary headache or neurological disorder. The doctor was reluctant to prescribe medication because the symptoms were alleviated when he was not at work. The doctor said he would order an MRI of the brain to determine if Plaintiff had some illness such as toxic meningitis which would account for the headaches. Tr. at 717.
On June 6, 2011, Plaintiff saw Charles Crivaro, D.C. Plaintiff complained of a week long history of pain across his low back into his right SI joint and right buttock. Plaintiff also complained of weakness in the right ankle and foot. The doctor noted that after Plaintiff's job moved into a new building in January 2011, he experienced debilitating headaches and 30 pound weight loss. Plaintiff said he felt as though he were in a mental fog. Tr. at 680. On June 10, 2011, Plaintiff reported no improvement. Tr. at 681. On June 24, 2011, Plaintiff reported some improvement, but was still sore in the right SI joint. The doctor opined that the ankle pain may be due to spending an extended time in bed due to work related headaches. Tr. at 682. On July 13, 2011, Plaintiff reported left SI joint pain which radiated to the mid thigh. Tr. at 683. On July 14 and 19, 2011, Plaintiff reported improvement and he said he was worse when he first gets out of bed. Tr. at 684-85. Plaintiff saw Dr. Crivaro on July 21, 25, 26, 29, August 2, and 8. Tr. at 686-91.
On June 17, 2011, Plaintiff saw Dr. Snyder for what was diagnosed as sinusitis. Tr. at 753-54.
On June 23, 2011, Dr. Snyder filled out a Hartford insurance company's Attending Physician's Statement of Functionality. Tr. at 718-19. The doctor wrote that Plaintiff could sit, stand and walk for two hours at a time, for a total of two hours per day. The doctor indicated that there was no restriction on Plaintiff's ability to lift and carry up to 50 pounds. No restrictions were noted for Plaintiff's ability to reach with either arm. The doctor wrote that Plaintiff's vision was impaired intermittently, but that his visual acuity was 20/20 in both eyes. The doctor wrote that Plaintiff does not have a psychiatric or cognitive impairment. When asked for "current restrictions or limitations, the doctor wrote: "Unable *999 to remain at work for 8 hours due to occurrence of symptoms while there. Usually unable to work [more than] 2 hours due to symptoms." Tr. at 719.
On September 1, 2011, Randall Ruisch, D.D.S., wrote that he had treated Plaintiff's dental problems for over twenty years. Dr. Ruisch wrote that Plaintiff is able to tolerate routine dental restorative work without dental anesthesia. The doctor wrote: "Mark has demonstrated unusual pain tolerance and an extremely high pain threshold." Tr. at 757.
On September 28, 2011, Plaintiff saw Elizabeth N. McCurdy, D.O., to discuss the possibility of returning to work. Tr. at 758-61. Plaintiff reported that when he went to work in a new building on January 18, 2011, he immediately had headaches, difficulty concentrating, difficulty with his eyes and diarrhea. Plaintiff reported that he was only able to work in the building for an hour per day. Tr. at 759. On physical examination, no abnormalities were noted, including a notation that Plaintiff was not currently having a headache. Tr. at 759-60. The doctor agreed to a plan which would allow Plaintiff to return to work on a progressively increasing basis, eventually leading to full time work. Tr. at 761 and 762. On October 7, 2011, Dr. McCurdy wrote that Plaintiff had done well and could resume normal full time work hours on October 10, 2011. Tr. at 766.
On November 10, 2011, Plaintiff saw Dr. Muller, who noted that Plaintiff's visual acuity in both eyes was 20/20. Tr. at 671.
On January 16, 2012, Plaintiff saw Amerlon Enriquez, M.D. for evaluation of obstructive sleep apnea and headaches. Tr. at 692-94. The doctor wrote: "A little more than a year ago he was moved to a different building for work and developed a lot of headaches, however has been moved again and the headaches resolved." Tr. at 693. Plaintiff also saw Dr. McCurdy on January 16. Tr. at 768-71. Plaintiff reported that he was not having headaches in his current office, which was in a different building. Tr. at 769.
On February 8, 2012, Plaintiff saw Teck K. Khoo, M.D., at Iowa Diabetes and Endocrinology Center. Tr. at 696-97. Although the focus of the treatment was diabetes, Dr. Khoo wrote that Plaintiff reported daily migraines, and Dr. Khoo suggested that Plaintiff see Dr. Puricelli to determine if a prophylactic was necessary. Tr. at 697.
On March 14, 2012, Sunil Bansal, M.D., submitted a report of an independent medical evaluation. Tr. at 698-708. After a review of the available medical records and Plaintiff's history, and after a physical examination, Dr. Bansal answered specific questions which had been submitted to him. The doctor was first asked the final diagnosis and prognosis, to which he answered chronic headache, eye strain, and fatigue. The doctor was asked to opine if the diagnosis was causally related to his work, and the doctor stated that it was clear that moving into the new building caused the chronic headaches, eye strain, dizziness, and fatigue. Tr. at 706. In response to a question regarding permanent partial impairment, the doctor opined that Plaintiff had a profound functional impairment: "The frequent headaches have deprived Mr. Condon [of] the ability to engage in productive work when they occur, especially with the lack of concentration, disorientation, dizziness, and eye strain that accompanies them." The doctor wrote that Plaintiff should avoid prolonged exposure to fluorescent lighting. The doctor wrote that Plaintiff would require ongoing treatment for chronic headaches. Tr. at 707.
On April 2, 2012, Anthony J. Sciorrotta, D.O., and John D. Kuhnlein, D.O., submitted a report regarding Plaintiff's claim of disability benefits caused by his exposure to sunlight and fluorescent light in the *1000 building in which he worked. Tr. at 628-32. The pages of this report are numbered and show that it is eleven pages in length. However pages two through seven are missing. The opinions expressed in the report were based on a review of the medical records rather than a medical examination. Tr. at 623. The doctors opined that there was no objective evidence that exposure to anything in the workplace was the cause of Plaintiff's headaches. The doctors opined that Plaintiff has other medical conditions-such as hypertension, diabetes, obstructive sleep apnea, and smoking-which can as easily explain his symptoms; the symptoms were present prior to working in the building; there is no evidence of exposure unique to the workplace to explain the symptoms; physicians' opinions relating the symptoms to the work environment were based on Plaintiff's statements rather than on objective data. Tr. at 629. The doctors noted that their review of the medical records showed that Plaintiff complained of fatigue, concentration issues, and eye problems as early as 2008. Tr. at 630. Dr. Sciorrotta and Dr. Kuhnlein wrote that they disagreed with Dr. Bansal's opinion Plaintiff's complaints are related to his work for the State of Iowa. Tr. at 632.
On June 18, 2012, Plaintiff saw Dr. McCurdy. Tr. at 472-76. Plaintiff's medical problems were: history of chronic headaches ; migraine headaches; nicotine dependence; obstructive sleep apnea ; anxiety disorder; type 2 diabetes ; obesity ; hyperlipidemia ; hypertension ; suspected allergic rhinitis ; chronic diarrhea of unknown origin. Plaintiff reported that the lighting in the building in which he works, cause headaches. Plaintiff said that when he enters the building his stomach will begin to churn and will become uncomfortable and painful. Plaintiff correlated the headaches and diarrhea-both of which he attributed to the work environment. The doctor noted that Plaintiff was obese with a body mass index of 31.5. Plaintiff's diabetes was noted to be well controlled. The doctor noted that a neurologist had prescribed meloxicam and Topamax. Plaintiff had been referred to a neurologist at the University of Iowa Hospitals and Clinics. Plaintiff reported that because of headaches, he needed to go home for a nap during the lunch break. Plaintiff was very upset about the decline in his ability to function at work. Plaintiff also complained of nasal congestion and rhinorrhea when using his CPAP. Tr. at 473. On physical examination, other than some nasal congestion, no abnormalities were recorded. Tr. at 474. The doctor noted that Plaintiff had brought disability paper work but that he was not in a hurry to have it filled out, and he was hopeful that the doctors at the University of Iowa would be able to recommend something to resolve his problems. Tr. at 475.
On August 31, 2012, Plaintiff was seen by E. Torage Shivapour, M.D., at the University of Iowa Hospitals and Clinics neurology clinic. Tr. at 404-08. Plaintiff reported that shortly after his job required moving into a new building in January 2011, he began to notice that the lights in the new building were hurting his eyes and causing headaches. As time went on, Plaintiff developed additional symptoms such as nausea, elevated blood sugar, poor sleep, frequent diarrhea and weak ankles. Plaintiff needed to tape his ankles in order to walk. Plaintiff also noted cognitive changes such as difficulty following a train of thought and low mood. Plaintiff had a constant feeling of fatigue requiring frequent naps. Plaintiff said that he felt grouchy and unsociable. He became increasingly sensitive to light such that he could not tolerate going to movies, church, or restaurants. Tr. at 404. The symptoms persisted even after Plaintiff changed buildings in September 2011. The doctor noted that the headaches had elements of both migraine *1001 and tension headaches, but they were not typical for either type. The doctor also noted that work-up, including an MRI of Plaintiff's brain, had been negative. Tr. at 407. Because of Plaintiff's affect, cognitive complaints, and self reports of low mood and personality changes, the doctor asked Plaintiff to undergo some psychological testing. Tr. at 407-08.
On September 5, 2012 Plaintiff saw Dr. McCurdy. Tr. at 477-80. Plaintiff reported having sensitivity to all types of fluorescent lighting. On Review of systems, chronic fatigue, chronic persistent daily headaches-with no increase in frequency or severity, chronic insomnia and depressed mood were all noted. On physical examination, no abnormalities were noted. Tr. at 478. Plaintiff was encouraged to continue working with the sleep specialist to treat obstructive sleep apnea. Plaintiff was encouraged to get regular exercise and make healthy lifestyle changes to combat his chronic fatigue. Plaintiff was encouraged to follow through with the recommendations made after neuropsychological testing. Tr. at 479
On September 12, 2012, Plaintiff saw Daniel Tranel, Ph.D., at the University of Iowa Hospitals and Clinics. Tr. at 409-11. Plaintiff reported that he had been an accountant and an expert witness for the Iowa State Attorney General with a speciality focus on utilities. Plaintiff said that because of the headaches, he was missing 8 to 24 hours of work each two week pay period. Tr. at 409. Plaintiff's intellectual functioning, as the psychologist expected, fell in the average, high average and superior ranges. On other tests-Beck Inventories, MMPI-2, Survey of Pain Attitudes, and Coping Strategies Questionnaire-Plaintiff endorsed a broad spectrum of somatic complaints such as dizziness/lightheadedness, abdominal discomfort or indigestion, loss of energy/fatigue, hypersomnia, loss of interest in sex, cognitive complaints, and a pessimistic outlook on his future. Tr. at 410. Under the heading "Impressions," Dr. Tranel wrote:
Our examination indicates major psychological factors in Mr. Condon's chronic pain and cognitive complaints. The attitudes he harbors about headaches (as threatening, irrepressible, and immobilizing), his habitual reactions to HA pain (withdrawing from activities and relationships, taking daytime naps that likely interfere with nighttime sleep), and his social role difficulties (work, family, marriage, etc.) are probably components of a broader somatic symptom-maladjustment-stress-illness process. Psychological treatment that focuses on identifying and modifying ineffective symptom-related attitudes, rituals, and interpersonal relations could have substantial beneficial effects.
Dr. Tranel gave Plaintiff the name of a psychologist close to his home, and the web site of the Iowa Psychological Association. Tr. at 411.
On September 17, 2012, Plaintiff saw Dr. Khoo. Plaintiff's A1c was 6.3. Plaintiff's diabetic medication was metformin which was taken twice per day. Tr. at 389. The doctor's assessment was that Plaintiff's diabetes was controlled and that he could be treated by his primary care physician. Tr. at 391.
On October 30, 2012, Plaintiff saw Dr. Puricelli. Tr. at 393-95. The doctor noted that Plaintiff had been seen at the University of Iowa Hospitals and Clinics where a psychological test had shown functional somatic and cognitive symptom complaints. Dr. Puricelli wrote that no neurological abnormalities had been found. The doctor wrote: "The patient has declined a referral to a psychologist or psychiatrist for treatment since his medical records are 'discoverable'. He continues to see (sic)
*1002 compensation for his headaches from his employer." Tr. at 393. Dr. Puricelli offered a referral to a local psychologist or psychiatrist, but Plaintiff declined. Tr. at 395.
On November 9, 2012, Plaintiff saw Dr. Muller. Diagnoses included myopia and presbyopia, but no other abnormalities were noted. Tr. at 507-08.
On December 4, 2012, Plaintiff saw Mishelle L. Paullus, FNP at the University of Iowa Hospitals and Clinics neurology clinic. Tr. at 412-15. Plaintiff reported that his headaches were slightly worse since discontinuing the medication Topamax, but he noticed that his thinking was slightly more clear. Nurse Paullus noted the testing and recommendations made by Dr. Tranel, and Plaintiff said he felt the psychological factors were more the sequelae of his chronic pain, but that he had scheduled an appointment with a Des Moines psychologist-Samuel Graham. Plaintiff reported using hydrocodone for his worst headaches. Tr. at 412. Nurse Paullus prescribed Depakote which she said was helpful both as a headache preventative and as a mood stabilizer. Tr. at 414. Plaintiff was advised to use a minimum number of hydorcodone because of long-term side effects. Plaintiff was also advised to engage in regular exercise, improve his nutrition, stop smoking, observe good sleep hygiene and stress management. Tr. at 415.
On December 10, 2012, Plaintiff saw Sam L. Graham, Ph.D. for an initial evaluation. Tr. at 431-32. Plaintiff reported that he had worked for the State of Iowa for 23 years, but that after his office was moved to a new building, he experienced a dramatic increase in headaches, nausea, vomiting, and occasional diarrhea. Plaintiff said that he was eventually fired from his job, but after the Union intervened on his behalf, he was reinstated and moved to a different building. Dr. Graham noted that Plaintiff "was somewhat loquacious as he described his situation and I could not complete the initial evaluation in an hour." Tr. at 431. Plaintiff returned to Dr. Graham's office on December 28, 2012. Dr. Graham's Axis I[3] diagnosis was pain disorder associated with both psychological factors and a general medical condition; rule out adjustment disorder NOS. On Axis II, diagnosis was deferred. On Axis V, the global assessment of functioning (GAF) was rated at 64[4] . The doctor noted that at the next session, Plaintiff would be given "relaxation training protocol." Tr. at 430.
On January 3, 2013, Plaintiff saw Gregory A. Hicklin, M.D., at the Iowa Clinic. Tr. at 418-20. The purpose of the visit was to renew Plaintiff's prescription for a CPAP machine for treatment of sleep apnea. Tr. at 732-34.
On January 4, 2013, Plaintiff saw Dr. Graham who instructed Plaintiff to use "autogenic training" which Plaintiff was to do twice a day. Tr. at 428.
On January 9, 2013, Plaintiff saw Dr. McCurdy. Tr. at 481-84. The doctor noted *1003 that the neurologist at the University of Iowa recommended that Plaintiff stop taking hydorcodone/acetaminophen and begin taking Depakote. Dr. McCurdy made that medication change. Plaintiff was taking meloxicam prescribed by Dr. Purcelli, which he reported was somewhat helpful. Tr. at 482. No abnormalities were noted on physical examination. Tr. at 483. Plaintiff also saw Kristel Howell, ARNP regarding the CPAP machine for treatment of sleep apnea. Tr. at 500-01.
Plaintiff saw Dr. Graham on January 11, 2013, and reported that he was using the autogenic protocol, but not regularly. Dr. Graham provided some EMG biofeedback. Tr. at 427. On January 28, 2013, Plaintiff told Dr. Graham that the Depakote was working as well as the medication it replaced. Plaintiff reported that the autogenic training tape had been beneficial and that he was using it on a twice daily basis. Tr. at 426. On March 4, 2013, Dr. Graham noted that Plaintiff was coping adequately using the techniques provided. The doctor wrote: "We appear to have met his basic treatment goals at this time." Plaintiff was told that he could return on an as needed basis. Tr. at 425.
On March 25, 2013, saw Dr. Crivaro. Plaintiff reported that two months previous, he slipped on ice and jammed his left shoulder. Plaintiff also reported the difficulty he was having with headaches. Plaintiff reported a 30 pound weight loss, and he said he felt as though he was in a mental fog. Tr. at 57. Between March 25 and July 19, Plaintiff saw Dr. Crivaro thirteen times. Tr. at 456-69.
On May 10, 2013, Plaintiff saw Dr. McCurdy. Tr. at 486-89. It was noted that Plaintiff gained 10 pounds since his previous visit, that he was not getting regular exercise nor eating a healthy diet, and he continued to smoke. Plaintiff reported that the Depakote was helping with his headaches and that he did not notice any side effects. Tr. at 487.
On July 1, 2013, Plaintiff saw Dr. McCurdy. Tr. at 490-94. Plaintiff reported that he had lost his job due to medical issues, and he requested that the doctor complete paper work related to long term disability. Tr. at 490. Plaintiff reported that while the Depakote helped with the headaches, it made him feel as though he was in a fog making concentration difficult. The doctor wrote: "This is a several year ordeal for him that [is] not improving and he feels like he cannot adequately control it with medication and still function effectively at his job. Some of the medications used to control the pain, headaches and migraines make him feel groggy and worsen the cognitive/memory and fatigue issues." Tr. at 491. No abnormalities were noted on physical examination. Tr. at 492. Dr. McCurdy completed a Hartford insurance company Attending Physician's Statement of Functionality. Tr. at 720-21. The doctor noted the primary diagnosis was headaches, and the secondary diagnosis was visual disturbances. Subjective symptoms were headaches, vision changes, nausea, increased when entering work. The doctor was asked to list pertinent test results, and she stated that testing had been done by several specialists (neurology, endocrinology, ophthalmology, sleep specialist and psychiatry), but she did not list any specific results. Likewise, the doctor did not write anything in response to a question asking for physical examination findings. Tr. at 720. The doctor responded to the questions regarding Plaintiff's exertional limitations in the same manner as did Dr. Snyder (see Tr. at 719), i.e., that Plaintiff can sit, stand and walk for two hours at a time for a total of 2 hours; can lift and carry up to 50 pounds, and has no limitations on his ability to reach. The doctor noted cognitive changes, memory difficulties, insommnia, and depression due *1004 to chronic pain and sleep disturbances. The doctor wrote: "Unable to remain at work for 8 hours due to occurrence of symptoms while at work [more than] 1-2 hours. Tr. at 721.
On September 10, 2013, Plaintiff saw Dr. McCurdy. Tr. at 495-99. Plaintiff reported that since he had stopped working, he was able to control his exposure to artificial lighting which was the trigger for his headaches. Plaintiff reported being more physically active but not following a regular exercise program. He said that his knee pain had improved with walking. Plaintiff said he wanted to try to minimize the use of medication and to control his medical problems with healthy lifestyle changes. Plaintiff was still smoking two packs per day but he denied any shortness of breath or wheezing. Tr. at 496. The doctor's diagnosis included knee pain/chronic low back pain, osteoarthritis in multiple joints. The doctor recommended that Plaintiff continue with his current medication and to engage in low impact aerobic exercise and regular stretching to keep the muscles toned and flexible. Tr. at 498.
A chest x-ray dated September 10, 2013 did not show any cardiac or pulmonary abnormalities, but degenerative changes in the thoracic spine was noted. Tr. at 551. A pulmonary function test on September 19, 2013, did not show any abnormality. Tr. at 519.
An MRI of Plaintiff's abdomen dated October 7, 2013, showed hemangiomas on the liver and gallstones. The MRI also showed: "lumbar spinal stenosis-incompletely characterized." Tr. at 547-48.
On December 3, 2013, Plaintiff saw Archana Verma, M.D., to discuss hemangioma, gall stones, and diarrhea. Plaintiff was given advise on an appropriate diet, and was advised to have laboratory studies and an ultrasound examination. Plaintiff was also advised to lose 20 pounds in the next six months. Tr. at 633. Plaintiff was also given information on how to quit smoking. Tr. at 636-37.
On December 30, 2013, Plaintiff saw Beth Triebel, O.D., for an eye examination. Tr. at 595-600. In a letter to Dr. McCurdy, Dr. Triebel wrote that Plaintiff's corrected visual acuity was 20/20 in both eyes. Diagnoses were myopia, presbyopia, and astigmatism -regular. Tr. at 612.
On December 30, 2013, State Agency medical consultant Rene Staudacher, D.O., reviewed the evidence in Plaintiff's claim and determined that he was capable of lifting 50 pounds occasionally, and 25 pounds frequently; that he could stand and/or walk about 6 hours per day; that he could sit about 6 hours per day. The doctor wrote that the limitations were due to degenerative changes of the spine and level 1 obesity. Tr. at 107. The doctor noted that Plaintiff should: "Avoid excessive noise, bright lights and fumes, etc. so as to avoid possible headache triggers. Avoid concentrated exposure to hazards if the cl. is taking any narcotic pain meds." Tr. at 108.
On January 6, 2014, State Agency psychological consultant Aaron Quinn, Ph.D., reviewed the evidence in the claim file and determined that while Plaintiff has intermittent difficulties following detailed instructions, sustaining attention and concentration, maintaining pace, maintaining interpersonal function and handling changes, he is still able to sustain work activity in simple tasks. Tr. at 111-12.
On January 10, 2014, Plaintiff saw Jon J. Van Der Veer, D.O. Tr. at 608-09. The doctor wrote:
The patient is here today to discuss his long-term diabetes, hypertension, meds, and to review the labs that he had drawn earlier this morning. His A1c is 6.3. It looks very good. He states that he continues to have issues and it appears *1005 he is going to be living under a bridge in less than a year since his long-term disability and now his social security have been denied. He has severe headaches secondary to fluorescent lighting. This has been going on for quite some time. I told him that I need to review his whole history and I will do all I can [to] help him. He has lost pretty much lost all faith in the medical system. He has seen multiple specialists including neurology at the University of Iowa. Dr. Kelly Ruon, as well as the previous providers here. He has also seen ophthalmology.
The doctor noted that Plaintiff's diabetes was well controlled. During the examination, Plaintiff was irritable and he kept his eyes hidden. Tr. at 609.
On January 13, 2014, Plaintiff saw Rebecca Blair, ARNP, regarding use of the CPAP. It was noted that Plaintiff was using the machine as instructed. Tr. at 610-11. Plaintiff also saw Jason Mohr, D.O. on that date. The doctor continued Plaintiff's prescription for the CPAP. Tr. at 728-30.
On February 14, 2014, Plaintiff saw Dr. Verma to discuss the findings on the October 7 MRI. Tr. at 571-75. Plaintiff reported that he drank six to eight beers per week. Tr. at 571. The plan was to treat Plaintiff for chronic liver disease. Plaintiff was advised to lose 5-10 percent of his weight in six months. Tr. at 573. Plaintiff was also advised to reduce his beer intake to less than one per day. Tr. at 574.
On February 24, 2014, State Agency medical consultant John May, M.D., reviewed the evidence in the file and affirmed the previously found residual functional capacity finding. Tr. at 125-26. State Agency psychological consultant Scott Shafer, Ph.D., determined that the new evidence in the record did not provide a basis to significantly change the initial decision. The mental residual functional capacity finding was affirmed. Tr. at 128-29.
On April 23, 2014, Sunil Bansal, M.D. submitted another report. Tr. at 624-27. The doctor reviewed the reports from the University of Iowa Hospitals and Clinics dated August 31, 2012. The doctor also reviewed reports and/or notes from Dr. Tranel, Nurse Paullus, Dr. Puricelli, Dr. McCurdy, Dr. Brown[5] , and Dr. Graham. The doctor wrote that the additional reports were consistent with Plaintiff's complaints of fluorescent light induced headaches. The doctor wrote that he stood by his opinions expressed in his IME report. Tr. at 626. Dr. Bansal wrote that he disagreed with the opinion of Dr. Brown that absent objective findings there is no disability. The doctor wrote that Plaintiff has an exposure dependent response which has been consistent throughout the clinical presentation. The doctor's opinion was that Plaintiff should avoid work in a setting with fluorescent lighting. Tr. at 627.
On May 27, 2014, Plaintiff saw Dr. Verma. Tr. at 640-42. The doctor ordered laboratory work and said that an ultra sound and liver function studies would be repeated in six months. Tr. at 640.
On May 30, 2014, Plaintiff saw Dr. Van Der Veer. Tr. at 773-76. Plaintiff and the doctor discussed the tests ordered by Dr. Verma. Plaintiff reported that he was feeling well otherwise although he said the lights in the doctor's office were bothering him. Tr. at 773.
On June 4, 2014, one of the tests ordered by Dr. Verma was positive and indicative of inflammatory diarrhea. Tr. at 648. Plaintiff underwent a colonoscopy on *1006 July 10, 2014. Tr. at 654-56. The study showed internal hemorrhoids, sigmoid diverticulosis, colon polyps which were removed and sent to be biopsied. Tr. at 655.
On September 3, 2014, Plaintiff saw Dr. Van Der Veer regarding his diabetes. Tr. at 777-79. The doctor noted that Plaintiff continued to have headaches when ever he was exposed to fluorescent lights. The lights in the examination room were turned off to make Plaintiff feel more comfortable. Tr. at 779.
On January 14, 2015, Plaintiff saw Dr. Mohr to renew his CPAP prescription. Tr. at 725-27. Plaintiff reported a continued intolerance to light. Tr. at 725.
On March 2, 2015, Plaintiff saw Dr. Van Der Veer for a recheck of diabetes. Tr. at 781.
On May 15, 2015, Dr. Van Der Veer answered written questions. The doctor stated that since January 2014, he had treated Plaintiff for migraine headaches. When asked if Plaintiff would be able to do a job involving lifting, carrying, standing and sitting, the doctor responded: "I do not agree. Yes, he is physically able to do this if no light triggers are present. Once headaches start, he could not do this at all." The doctor opined that Plaintiff is not able to work because non-incandescent lighting is ubiquitous. The doctor opined that Plaintiff's complaints are credible based on the doctor's observations when Plaintiff is having headaches. Tr. at 742.
On August 10, 2015, Plaintiff saw Dr. Van Der Veer. Tr. at 830-33. The doctor ordered several laboratory tests (Tr. at 801-30) none of which produced abnormal results. Tr. at 806.
On September 8, 2015, Plaintiff saw Dr. Graham for a mental status examination. Tr. at 834-37. Plaintiff reported the onset of headaches with exposure to fluorescent lights, LCD lights and flat screen lights. Tr. at 834. Dr. Graham's Axis I diagnoses were: somatic symptom disorder with predominant pain, persistent, severe; and major depressive disorder. Dr. Graham opined that Plaintiff's ongoing physical pain disorder and major depressive disorder"...would appear to combine to disable him for competitive employment." Dr. Graham opined that Plaintiff is not able to maintain concentration, attention and pace in normal competitive work environments. Tr. at 836.
ADMINISTRATIVE HEARING
At the administrative hearing (Tr. at 42-99), Plaintiff was asked what he experiences when exposed to non-incandescent lighting, to which he responded: "I start getting a burning in my eyes and a pain in my front forehead, and it spreads around to the side." In addition, he said, his stomach begins to churn and growl. He said he also experiences diarrhea. Tr. at 53. Plaintiff testified that he injured his back when he was 18 years old, and that he had back pain three to six times per month. Tr. at 64. Plaintiff testified that if he had a job that required him to lift twenty five pounds frequently, he would miss a lot of work because of back pain. Tr. at 66. Plaintiff testified that in 2008, he underwent rotator cuff surgery on his right shoulder. Tr. at 67.
After Plaintiff testified, the ALJ called Randall Harding to testify as a vocational expert. Tr. at 82. In response to the hypothetical question which contained the elements of the ALJ's residual functional capacity finding (Tr. at 84), the vocational expert testified that Plaintiff's past relevant work is not possible, but that unskilled jobs exist that could be performed. Tr. at 84-55. The ALJ asked the vocational expert to consider an individual who "may only have frequent exposure to non-incandescent lighting." Tr. at 87. The vocational expert stated that "frequent" implied up to *1007 66% of the time. The vocational expert went on to testify that because of the variability of lighting within any given building, he would not be able to answer the question. Tr. at 88-89. When asked for examples of jobs which allow for the wearing of sun glasses, the vocational expert cited jobs such as window cleaner, and landscape specialist. Tr. at 91. The vocational expert also testified that absences of three or more days per month would eliminate the possibility of all work as would the necessity to work at a slow pace for a third of a work day.
ADMINISTRATIVE DECISION
In his decision, the ALJ noted that the finding of residual functional capacity requires a two-step process: 1) a determination that there is an underlying medically determinable physical or mental impairment (s) that can reasonably be expected to produce the pain or other symptoms; 2) an evaluation of the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit the claimant's functioning. Tr. at 20. The ALJ wrote that Plaintiff's credibility had been evaluated under the standards set forth in Polaski v. Heckler , 751 F.2d 943 (8th Cir. 1984), and 20 C.F.R. §§ 404.1529 and 416.929. Tr. at 21. The ALJ found that while Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, his statements concerning the intensity, persistence and limiting effects of the symptoms were not "entirely credible," because the objective findings in the medical evidence fail to provide strong support for the allegations of symptoms which produce limitations on the claimant's ability to perform basic work activities. Tr. at 22.
The ALJ wrote that he considered the opinion of Dr. McCurdy that Plaintiff was unable to work for eight hours because of his symptoms. The ALJ gave minimal weight to Dr. McCurdy's opinion because the limitations were inconsistent with the evidence as a whole, and because the doctor relied on Plaintiff subjective complaints. Tr. at 23-24.
The ALJ weighed the opinion rendered by Dr. Bansal against those rendered by Dr. Sciorrotta and Dr. Kuhnlein. The ALJ found the Sciorrotta/Kunlein opinions more persuasive. Tr. at 24.
The ALJ considered the opinion of Dr. Van Der Veer, but gave it minimal weight because the doctor relied on Plaintiff's subjective complaints. Tr. at 25.
The ALJ considered the September 8, 2015 report submitted by Dr. Graham. The ALJ accorded minimal weight to the opinion that Plaintiff is not able to maintain concentration, attention, and pace in a normal competitive work environment "in that the claimant showed only mild neurocognitive functioning and Dr. Graham stated specifically that the claimant was oriented in all spheres and his attention was easily gained and directed, which is inconsistent with findings." Tr. at 25. The ALJ went on: "Additionally, had Mr. Graham performed a records review he would see that the claimant consistently maintained a body mass index of 32 throughout the entire medical record and records actually show he gained weight and was advised to lose weight for diabetic purposes.[6] " Tr. at 25-26.
The ALJ wrote that he gave significant weight to the opinions rendered by the State Agency medical consultants, especially regarding Plaintiff's physical limitations. The ALJ found the State Agency opinions consistent with the medical evidence as a whole. Tr. at 26.
*1008 DISCUSSION
We will affirm the ALJ's decision "[i]f the ALJ's findings are supported by substantial evidence on the record as a whole," an inquiry that requires us to consider evidence in the record that detracts from the ALJ's decision. Wagner v. Astrue , 499 F.3d 842, 848 (8th Cir. 2007). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." Reutter ex rel. Reutter v. Barnhart , 372 F.3d 946, 950 (8th Cir. 2004).
We will not reverse the ALJ's "denial of benefits so long as the ALJ's decision falls within the 'available zone of choice.' " Bradley v. Astrue , 528 F.3d 1113, 1115 (8th Cir. 2008) ). The decision of the ALJ "is not outside the 'zone of choice' simply because we might have reached a different conclusion had we been the initial finder of fact." Id. (quoting Nicola [v. Astrue ], 480 F.3d [885] at 886 [ (8th Cir. 2007) ] ). Rather, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." Goff v. Barnhart , 421 F.3d 785, 789 (8th Cir. 2005).
Owen v. Astrue , 551 F.3d 792, 798 (8th Cir. 2008.) In Brand v. Secretary of Dept. of Health , Education and Welfare , 623 F.2d 523, 527 (8th Cir. 1980), Chief Judge Lay wrote that Universal Camera Corp. v. NLRB , 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951) is "the guideline for the evaluation of the standard of review." In Universal Camera , the Court wrote:
We conclude, therefore, that the Administrative Procedure Act and the Taft-Hartley Act direct that courts must now assume more responsibility for the reasonableness and fairness of Labor Board decisions than some courts have shown in the past. Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds. That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, by courts invested with the authority and enjoying the prestige of the Courts of Appeals. The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both.
Id. , 340 U.S. at 490, 71 S.Ct. 456. In reviewing disability decisions from the Social Security Administration, the Court sits in an appellate capacity and is responsible for giving the agency decision a scrutinizing analysis. This requires the Court to determine the substantiality of the evidence by determining if the ultimate decision is supported by substantial evidence on the record as a whole. Gavin v. Heckler , 811 F.2d 1195, 1199 (8th Cir. 1987). In Gavin , the Court wrote:
In the review of an administrative decision, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight. Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory. It follows that the only way a reviewing court can determine if the entire record was taken into consideration is for the district court to evaluate in detail the evidence it used in making its decision and how any contradictory evidence balances out.
*1009 Id. (internal citations and quotations omitted).
In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. Wilcutts v. Apfel , 143 F.3d 1134, 1136-37 (8th Cir. 1998) citing Brinker v. Weinberger , 522 F.2d 13, 16 (8th Cir. 1975).
The most important issue in any disability case which proceeds beyond step three of the sequential evaluation is that of residual functional capacity. McCoy v. Schweiker , 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc).
... The RFC that must be found ... is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.
Id.
For reversal, Plaintiff makes two arguments: 1) The ALJ failed to properly evaluate the opinions of the treating and examining medical providers-McCurdy, Graham, Bansal, Van Der Veer, and Snyder; and 2) The ALJ erred in his credibility determination of Plaintiff's subjective complaints. The Court will consider these arguments in reverse order. Plaintiff also argues the proper remedy is a reversal with an order to award benefits, or in the alternative, for an order of remand for further development.
I. CREDIBILITY
The ALJ acknowledged that credibility must be evaluated using the standards agreed to in the Polaski cases (e.g., Polaski v. Heckler , 739 F.2d 1320 (8th Cir. 1984) ; Polaski v. Heckler , 751 F.2d 943 (8th Cir. 1984) ) and regulations found at 20 C.F.R. §§ 404.1529 and 416.929. The factors which must be considered when evaluating credibility are: 1) daily activities; 2) duration, frequency and intensity of pain; 3) precipitating and aggravating factors; 4) dosage, effectiveness and side effects of medication; and 5) functional restrictions. Although subjective complaints may be discounted if there are inconsistencies in the evidence as a whole, and while the claimant bears the burden of proving that disability results from a medically determinable physical or mental impairments, "[t]he adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them." Polaski v. Heckler , 739 F.2d at 1322. As the Commissioner points out in her brief, an ALJ is not required to explicitly discuss each factor. Ford v. Astrue , 518 F.3d 979, 982 (8th Cir. 2008) ; Goff v. Barnhart , 421 F.3d 785, 790 (8th Cir. 2005).
In the case at bar, the ALJ noted that Plaintiff's complaints were not "entirely credible" because the objective findings in the medical evidence fail to provide strong support for the allegations..." In Nowling v. Colvin , 813 F.3d 1110 (8th Cir. 2016), the claimant suffered from diagnosed conversion disorder and somatoform disorder manifested by pseudo-seizures, migraine headaches, mood disorder, anxiety disorder and personality disorder. Id. at 1113. The Court, citing Easter v. Bowen , 867 F.2d 1128, 1129 (8th Cir. 1989), wrote: "Conversion disorder is a phenomenon in which a person actually and subjectively experiences symptoms without a known underlying medical cause." Nowling , at 1113-114. The Court of Appeals recognized the difficulty assessing credibility in such cases. "[A] prime feature of conversion disorder may be a disconnect between the actual severity of symptoms demonstrated by clinical evidence and the way the applicant subjectively perceives the symptoms." Id. at 1114 citing Easter , at 1130. The Nowling court wrote:
*1010 Given this disconnect, an obvious difficulty arises when it becomes necessary to make credibility assessments in cases involving somatoform phenomena. Subjective perceptions of somatoform effects may, in fact, be debilitating even when clinical or diagnostic medical evidence does not fully support the claimed symptoms. It nevertheless remains necessary to make credibility assessments in these settings, and "[i]n cases involving somatoform disorder... an ALJ is not free to reject subjective experiences without an express finding that the claimant's testimony is not credible. Metz v. Shalala , 49 F.3d 374, 377 (8th Cir. 1995). Where such a finding has been made, "[w]e will not disturb the decision of an ALJ who considers, but for good cause expressly discredits, a claimant's complaints ... even in cases involving somatororm disorder." Gowell v. Apfel , 242 F.3d 793, 796 (8th Cir. 2001).
The Court went on to state that if an ALJ finds that the claimant suffers from a somatoform disorder, but also finds the claimant at least partially non-credible, the ALJ ideally should set forth the credibility determination with sufficient detail to expressly inform the reviewing court as to the factual details of the claimant's limitations as accepted or believed by the ALJ. Id. at 1114.
As noted above, although the Polaski factors must be considered before discounting subjective complaints, the adjudicator is not required to discuss each factor. Bryant v. Colvin , 861 F.3d 779, 782 (8th Cir. 2017). In Bryant , the Court noted that the ALJ used numerous facts to assess Bryant's credibility: work history; inconsistency between complaints, personal history and medical record; circumstances surrounding Bryant's retirement; minimal or no medical support for complaints of rheumatoid arthritis or osteoarthritis. Id. at 782-83. The Court wrote: "[W]e defer to the ALJ's determination regarding the credibility of witnesses so long as such determinations are supported by good reasons and substantial evidence." Id. at 783 quoting Vester v. Barnhart , 416 F.3d 886, 889 (8th Cir. 2005). In the case at bar, the only reason given by the ALJ for finding Plaintiff's testimony "not entirely credible" was that the testimony was not fully supported by objective medical evidence. However, the ALJ's analysis fails to take into account the mental health aspect of Plaintiff's perception of pain-in spite of finding that Plaintiff's severe impairment include "somatic symptom disorder, with predominant pain, persistent and severe," and "pain disorder associated with both psychological factors and general medical condition." The Court agrees with Plaintiff that the ALJ's credibility finding falls short of what is required.
II. MEDICAL OPINIONS
In Combs v. Berryhill , 868 F.3d 704 (8th Cir. 2017), the Court wrote that the opinion of a treating physician is accorded special deference under the social security regulations and is normally entitled to great weight. In Vance v. Berryhill , 860 F.3d 1114, 1120 (8th Cir. 2017), the Court wrote:
A treating physician's opinion is entitled to controlling weight when it is supported by medically acceptable techniques and is not inconsistent with substantial evidence in the record. Julin v. Colvin , 826 F.3d 1082, 1088 (8th Cir. 2016) ; see also 20 C.F.R. § 416.927 (2011). But an ALJ need not give a treating physician's opinion controlling weight when the opinion is based on a claimant's subjective complaints that ALJ does not find credible. Julin , 826 F.3d at 1089.
In Aguiniga v. Colvin , 833 F.3d 896, 901-902 (8th Cir. 2016), the Court wrote:
*1011 An ALJ must assign controlling weight to a treating source's medical opinion if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial evidence." 20 C.F.R. § 404.1527(c)(2). Treating source opinions are generally entitled to substantial weight, but an ALJ may "justifiably discount" such an opinion when it is "inconsistent or contrary to the medical evidence as a whole." Martise v. Astrue , 641 F.3d 909, 925 (8th Cir. 2011) (second passage quoting Halverson v. Astrue , 600 F.3d 922, 930 (8th Cir. 2010) ). For example, an ALJ may discount a treating source opinion that is unsupported by treatment notes. Id. at 925-26.
In Papesh v. Colvin , 786 F.3d 1126, 1132 (8th Cir. 2015), the Court, discussing the weight to be given to treating source opinion wrote:
"Not inconsistent ... is a term used to indicate that a well-supported treating source medical opinion need not be supported directly by all of the other evidence (i.e., it does not have to be consistent with all the other evidence) as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion."
Id. quoting Social Security Ruling 96-2p, Policy Interpretation Ruling, Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions. 1996 WL 374188 (July 2, 1996).
The Court agrees with Plaintiff that the ALJ gave inadequate weight to the opinions rendered by the treating and examining doctors in this case. For example, Dr. Graham treated Plaintiff's psychological impairments. In addition, the psychologist saw Plaintiff's for a mental status examination on September 9, 2015. Tr. at 834-37. After a mental status examination using the St. Louis University Mental Status exam protocol, Dr. Graham diagnosed somatic symptom disorder with predominant pain, persistent and severe, and a major depressive disorder. Both of these impairments are included in the list of severe impairments at step two of the ALJ's sequential evaluation findings. Most significant, is Dr. Graham's use of the term "severe." The DSM-IV-TR defines "severe": "Many symptoms in excess of those required to make the diagnosis, or several symptoms that are particularly severe, are present, or the symptoms result in marked impairment in social or occupational functioning." DSM-IV-TR at 2. Dr. Graham went on to opine that Plaintiff is not able to maintain concentration, attention, and pace in a normal competitive work environment. Tr. at 836.
In Easter v. Bowen , 867 F.2d at 1129, the Court noted that while objective medical data supporting Easter's complaints was "of varying degrees of certainty and specificity," the ALJ had uncontradicted diagnoses of somatoform or conversion disorder. The Court held it was error for the ALJ to have substituted his judgment about Mrs. Easter's condition for that of her physicians. Id. at 1131.
Dr. Graham is both a treating and an examining acceptable source of medical/psychological information. See , 20 C.F.R. § 404.1513(a)(2). There is no suggestion that Dr. Graham's opinion is based on anything other than medically acceptable clinical diagnostic techniques, and the opinion is consistent with all the other evidence in this record. Dr. Graham's opinions and observations are consistent with those of the other medical providers, including Plaintiff's primary care physicians-Snyder and McCurdy, Dr. Bansal who performed an independent medical evaluation, and the opinion of Dr. Van Der Veer who treated Plaintiff on several occasions. None of the neurologists who saw Plaintiff doubted that he experiences headaches-only *1012 that the cause may be mental rather than physical in nature. It was the neurologist at the University of Iowa Hospitals and Clinics, Dr. Shivapour, who first suspected that psychological testing may be helpful in diagnosing and treating Plaintiff's headaches. It was because of the neuropsychological testing that Plaintiff found his way to Dr. Graham. From beginning to end, Plaintiff has been consistent in his complaints of debilitating headaches caused, in his mind, by artificial lighting. Doctors Sciorrotta and Kuhnlein do not suggest that Plaintiff does not have headaches-their professional opinion is that the headaches are not caused by Plaintiff's workplace. See Tr. at 629. Causation of the impairment is not material to the issues in the case before the Court.
The Court agrees that the ALJ assigned inappropriate weight to the opinions of the physicians who opined regarding Plaintiff's impairments and limitations.
III. REMEDY
After subjecting this case to the required scrutinizing analysis, Gavin v. Heckler , 811 F.2d at 1199, citing Smith v. Heckler , 735 F.2d 312, 313 (8th Cir. 1984), it is the holding of this Court that the ALJ's decision falls outside the zone of reasonable choice and must be set aside. The only remaining question is whether the case should be remanded for further development or for an award of benefits.
In Gann v. Berryhill , 864 F.3d 947, 952 (8th Cir. 2017), the Court wrote:
"The Commissioner may rely on a vocational expert's response to a properly formulated hypothetical question to meet her burden of showing that jobs exist in significant numbers which a person with the claimant's residual functional capacity can perform." Sultan v. Barnhart , 368 F.3d 857, 864 (8th Cir. 2004). But, we have held that "the [t]estimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical question." Tucker v. Barnhart , 363 F.3d 781, 784 (8th Cir. 2004). "Unless the hypothetical question comprehensively describes the limitations on a claimant's ability to function, a vocational expert will be unable to accurately assess whether jobs do exist for the claimant." Smith v. Shalala , 31 F.3d 715, 717 (8th Cir. 1994).
In Ness v. Sullivan , 904 F.2d 432, 436 (8th Cir. 1990), the Court, quoting Bradley v. Bowen , 800 F.2d 760, 763 n.2 (8th Cir. 1986), wrote: "We have repeatedly held that vocational testimony elicited by hypothetical questions that fail to relate with precision the physical and mental impairments of the claimant cannot constitute substantial evidence to support the Secretary's decision." In the case at bar, the ALJ found that Plaintiff's severe impairments include those diagnosed by Dr. Graham, but the hypothetical question does not capture the concrete consequences of those impairments. Therefore, the Court can not hold that the Commissioner has met her burden at step five of the sequential evaluation.
The consequences of Plaintiff's impairment are that he is not able to maintain concentration, attention, and pace in a normal competitive work environment. Tr. at 836. This is the testimony of Dr. Graham, an expert on mental illness. See Wilder v. Chater , 64 F.3d 335, 337 (7th Cir. 1995) ("Severe depression is not the blues. It is a mental illness; and health professionals, in particular psychiatrists, not lawyers or judges, are the experts on it.") Over the years, Plaintiff has demonstrated his inability to complete a normal work day and work week without interruptions from his psychologically based symptoms. When the vocational expert was asked about the effect of frequent absences from work, it was his testimony that competitive work is not *1013 possible. "Employers are concerned with substantial capacity, psychological stability, and steady attendance..." Rhines v. Harris , 634 F.2d 1076, 1079 (8th Cir. 1980). The Court in Rhines , pointed out that the Secretary, now the Commissioner, need not find a specific job for a claimant, but that if benefits are to be denied, "it must be shown that claimant can realistically perform in existing employment." Id. citing Brinker v. Weinberger , 522 F.2d at 18. See also Parsons v. Heckler , 739 F.2d 1334, 1340 (8th Cir. 1984) ("The Secretary's determination regarding the ability of a claimant to perform jobs in the national economy must take into account the actual ability of the claimant to find and hold a job in the real world.")
In Combs v. Berryhill , 868 F.3d at 709, the Court determined that there was an unresolved issue which needed to be developed, so that the proper remedy was a remand for further proceedings. However, in Gavin v. Heckler , 811 F.2d at 1201, the Court wrote: "[W]here the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his disability by medical evidence on the record as a whole, we find no need to remand." Here, as in the Easter case, a reversal with an order to award benefits is the appropriate remedy. Easter , 867 F.2d at 1131. In Parsons v. Heckler , 739 F.2d at 1341, the Court noted that the evidence in the case showed that Parsons had been consistently diagnosed with severe social and adjustment problems. The Court noted that if the case was remanded for vocational expert testimony, "such testimony would not erase or change the clinically observed and functionally corroborated fact that Parsons was mentally incapable of holding any job during that period. Where further hearings would merely delay receipt of benefits, an order granting benefits is appropriate." Id. , citing Tennant v. Schweiker , 682 F.2d 707, 710 (8th Cir. 1982). See also , Smith v. Heckler , 735 F.2d at 319 ("... because we are satisfied that substantial evidence on the record as a whole demonstrates that Smith is disable and that he is entitled to disability benefits ... we need not remand the case to the ALJ for further proceedings. See Baugus v. Secretary , 717 F.2d 443, 448 (8th Cir. 1983) ).
CONCLUSION AND DECISION
The Court has considered the evidence which supports, as well as the evidence which detracts from the decision made by the ALJ. After applying the balancing test noted in Gavin v. Heckler , 811 F.2d at 1199, and cases cited therein, this Court holds that the final decision of the Commissioner is not supported by substantial evidence on the record as a whole. This case is reversed and remanded for an award of the benefits to which Plaintiff is entitled.
The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412 (d)(1)(B) (Equal Access to Justice Act). See also, McDannel v. Apfel , 78 F.Supp.2d 944 (S.D. Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406 B), and LR 54.A(b)[7] . See also, Gisbrecht v. Barnhart , 535 U.S. 789, 122 S.Ct. 1817, 1821, 152 L.Ed.2d 996 (2002) ; Mitchell v. Barnhart , 376 F.Supp.2d 916 (S.D. Iowa 2005).
IT IS SO ORDERED.

Plaintiff's past relevant work was utility specialist consultant, and consultant union business representative. Tr. at 26. According to medical and psychological reports, Plaintiff worked as an accountant with the State of Iowa Attorney General's office with a speciality in utilities. According to the vocational expert who testified at the hearing, Plaintiff's past work required sedentary exertional activity. Tr. at 370.

Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601 et seq.

The Diagnostic and Statistical Manual of Mental Disorders, a publication of the American Psychiatric Association, sets forth a multiaxial assessment which mental health providers find useful when diagnosing and treating mental impairments. Axis I, classifies clinical disorders and other conditions that may be a focus of clinical attention. Axis II classifies personality disorders and mental retardation. Axis III classifies general medical conditions. Axis IV classifies psychosocial and environmental problems. And, Axis V is a Global Assessment of Functioning (GAF). DSM-IV-TR at page 27.

A GAF rating between 61 and 70 indicates some mild symptoms (e.g. depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the houshold), but generally functioning pretty well, has some meaningful interpersonal relationships. DSM-IV-TR at 34.

Dr. Bansal makes reference to "MES Solutions", Peer review dated August 21, 2013, Douglas Brown, M.D." Tr. at 626. The Court finds no other reference to evidence provided by Dr. Brown.

The ALJ did not explain the relationship of Plaintiff's body mass index to his ability to tolerate artificial lighting or to the other mental limitations noted by Dr. Graham.

N.B. Counsel is reminded that LR 54.A (b), states that an EAJA application "must specifically identify the positions taken by the government in the case that the applicant alleges were not substantially justified."